**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**PATRICIA G. LOLLEY,**

               **Plaintiff,**

**-vs-**                                              **Case No.  A-09-CA-674-SS**

**CARSON   ENERGY,   INC.   d/b/a
Carson Energy Group,**

               **Defendant.**

_____

## **O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, specifically Defendant Carson Energy, Inc. d/b/a Carson Energy Group's ("Carson Energy") Motion for Summary Judgment [#14], Patricia G. Lolley's ("Lolley") response thereto [#15], and Carson Energy's reply [#16].  Having considered the aforementioned documents, the case file as a whole, and the applicable law, the Court enters the following opinion and orders.

### **Background**

**I.**       **Lolley's Employment at Carson Energy**

Carson Energy is a privately-owned company involved in the exploration and development of natural gas reserves.  Def.'s Mot. Summ. J., Ex. B ("DeNefe Depo.") at 20. Lolley began working for Carson Energy in 1995 and, at the time of her resignation in 2008, was working as the Vice President of Administration and Technology.  *See* Def.'s Mot. Summ. J., Ex. A ("Pl. Depo.") at 9, 19.  In this capacity, Lolley had subordinates who reported to her, including a receptionist and an administrative assistant.  *Id.* at 19.

**A.    Lolley's Health Problems**

In her affidavit, Lolley states under oath that in April 2006 she began suffering "cardiac complications," and "missed work for stent placement."  Pl.'s Resp., Ex. B ("Pl. Aff.").  She states she missed work several more times over the next year and a half, but never for extended periods of time.  *Id.*

At some point after Lolley got sick in 2006, the owners of Carson Energy, Carter and Becky Bills, and Dan DeNefe ("DeNefe"), then the Executive Vice President of Carson Energy (now CEO), met with Carson Energy's insurance agent and a disability representative from the health insurance company to discuss the possibility of Lolley going onto long-term disability due to her heart condition.  Pl.'s Resp., Ex. A ("B. Bills Depo.") at 31.  According to Mrs. Bills, the Bills and DeNefe were informed that in order to gain long-term disability, Lolley's salary would have to be reduced for at least 90 days.  *Id.* at 36.  In December 2006, Lolley was told by Mr. Bills that she would be put on a reduced part-time schedule and reduced salary so that she could pursue a disability claim with the insurance company (at the same time, Carson Energy hired her husband as a consultant to make up the difference in her salary).  Pl.'s Resp., Ex. C. ("Pl. Depo.") at 40; B. Bills Depo. at 36-38.  Lolley testified she felt at the time that she probably could have worked full-time, but that her doctor (Dr. DeMaio) did advise her in January 2007 to work reduced hours.  *Id.* at 68; Pl.'s Resp., Ex. E.

The insurance company ultimately found Lolley did not qualify for long-term disability benefits, and denied her claim.  Pl. Depo. at 37-38, 97-98.  Lolley appealed the decision, although she asserts it was DeNefe's idea that she do so.  Pl. Depo. at 49.  After the appeal was denied by the insurance company, Carson Energy consulted an attorney about appealing the decision in court, but the attorney wrote a letter in March 2008 confirming that he did not believe Lolley

qualified for partial disability because her medical records did not indicate she was unable to perform the duties of her employment. *See* Pl.'s Resp. at Ex. H (letter from attorney). In fact, Lolley had been cleared to return to work without restrictions by her physician in October 2007, and Carson Energy reinstated her to full-time status and full-time wages at that time. Pl. Depo. at 65. Lolley claims she thereafter missed work twice on April 10 and 11, 2008 for "hospitalization," and had a stent placed on May 2, 2008. Pl.'s Resp. at 3.

### B.      Problems with Lolley's Employment

In its motion for summary judgment, Carson Energy offers evidence of two distinct problems with Lolley's employment, which are addressed in turn below.

### (1)      Delays in the 2008 K-1 process

First, Lolley testified that in October or November of every year, Carson Energy would start getting information about its clients' investments in each venture during the year ready to send to an outside CPA firm, so that IRS 1065 "K-1" tax forms could be processed for the clients.[1] *Id.* at 21. Lolley, who headed up the "administrative team" at Carson Energy, testified she would pull the relevant documentation together for each client and get the information for the K-1s ready to send to the CPA firm. *Id.* at 21-22. Paula Lloyd ("Lloyd"), Carson Energy's Vice President of Accounting, handled the "accounting side" of Carson Energy; thus, she would review the information assembled by Lolley, and then send it on to DeNefe for final review before it went to the CPA firm. *Id.* at 22; DeNefe Depo. at 116; Def.'s Mot. Summ. J., Ex. K ("DeNefe Aff.") at ¶ 5. DeNefe testified it is important that Carson Energy provide the information for the

---

[1]The K-1 tax forms document the financial performance of Carson Energy's investment clients for the year, and are essential for the clients to be able to prepare their individual tax returns, which are of course due to be filed on April 15 of each year. DeNefe Depo. at 92.

K-1s "well in advance of April 15th," so that its clients can file their individual tax returns on time.  DeNefe Depo. at 92.

DeNefe—who was the Executive Vice President of Carson Energy, and thus the immediate supervisor of Lloyd and Lolley—testified Carson Energy generally starts sending the information for the K-1s to the CPA firm in January of each year, and he expects about a third of the information to have been sent to the CPA firm by the "middle part of February."[2]  *Id.* at 93, 99.  Per an agreement with the CPA firm, Carson Energy was supposed to deliver the client information in batches rather than in one lump sum, so that the accountants would have time to get the completed K-1s to the clients well in advance of the April tax deadline.  *Id.* at 92, 98, 100.  However, DeNefe testified that in 2008 he began receiving calls from the CPA firm in January and early February, complaining they had not yet received any of the information for the K-1s from Carson Energy, and he also received calls from clients in the first few weeks of February, complaining they had not yet received their K-1s.  *Id.* at 98, 116.  DeNefe testified he felt Carson Energy was "way, way, way behind the standard time of providing [the information for the K-1s] to the CPA."  *Id.* at 98.

DeNefe testified he spoke to Lolley after he was first contacted by the CPA firm, and learned she and Lloyd were in the process of trying to get the information together, and "expected to get something there shortly."  *Id.* at 116-17.  He asked her if she needed help getting the K-1s out, and she told him she had things under control.  *Id.*  However, on February 27, 2008, DeNefe learned Carson Energy still had not provided even a single set of information for the K-1 processing.  *Id.* at 117-18.  DeNefe called a meeting with Lolley and Lloyd and told them "we

---

[2]Paula Lloyd also testified as to the typical time frame for the information being sent to the CPA firm, stating "[i]n January we should have already had some—at least a third of them out the door, a third to a half."  Def.'s Mot. Summ. J., Ex. D ("Lloyd Depo.") at 18.

had to get something there." *Id.* at 119-20.  Before the end of business on February 27, DeNefe learned the CPA firm had "miraculously" received four sets of information.  *Id.* at 120.  Lolley claims in her affidavit that she did not know DeNefe was upset until he called the February 27th meeting, but that at the meeting he raised his voice and used the "f-word."  Pl. Aff. at 2.  She believed he was upset not just with the administration department (of which she was Vice President) but also the accounting department, which was led by Lloyd.  *Id.*  She states she was not singled out by DeNefe at the meeting as the sole cause of the delay.  *Id.*

In DeNefe's affidavit, he states that some time after he called the February 27th meeting with Lolley and Lloyd, he "consulted with various employees involved in the process and...confirmed that the hold-up in getting the information out to the CPAs in a timely manner was primarily due to [Lolley] causing delay on the administrative side."  DeNefe Aff. at ¶ 6. Likewise, Lloyd testified she believes the delay in getting the information to the CPA firm in 2008 was because Lolley simply "didn't start on them" in a timely manner; however, she stated she does not know any reason for Lolley's delay.  Lloyd Depo. at 19-21.  Lolley, however, offers the affidavit of Kay House ("House"), who worked in the accounting department of Carson Energy until May 2008.  *See* Pl.'s Resp., Ex. K. ("House Aff.") at 1.  House states one of Lolley's assistants, Shelby Chamberlain ("Chamberlain"), did not have the clerical skills required of her, and the errors in her work during the K1 process in early 2008 caused "extra work," and slowed down the process.  *Id.*  She states the "real problem" with the K1s was therefore "[Chamberlain's] inability to do the job."  *Id.* at 2.

### (2)    Problems with subordinates

Shortly after this delay in the K-1 process, which DeNefe believed had been caused by Lolley, one of Lolley's subordinates resigned.  The subordinate, Nicole Sapio ("Sapio")

submitted a letter to Carson Energy along with her resignation on April 23, 2008, documenting mistreatment she had suffered under the supervision of Lolley. *See* Def.'s Mot. Summ. J., Ex. H ("Sapio Depo.") at Ex. 1 ("Sapio Letter"). The letter set forth Sapio's complaints about the lack of training she had received, and about her treatment by other Carson Energy employees. *Id.* She stated she had been "confronted inappropriately every couple of days by one person," and that she was repeatedly yelled at and felt attacked by this person. *Id.* It is undisputed Sapio was referring to Lolley by these references.

DeNefe testified in his deposition that in the past there had been a large amount of turnover in the employees who were working under Lolley, and "a lot of friction," which he believed was generated by how Lolley was managing those employees and could have been avoided. DeNefe Depo. at 48. He testified that in the past, when he had left the management of Lolley's subordinates almost exclusively to her, many of them had quit. *Id.* at 46. DeNefe testified this problem was ongoing, and "got worse and worse" as time went on. *Id.* at 48. DeNefe believed the complaints raised by Sapio in her letter documented inappropriate, and possibly abusive, behavior on the part of Lolley, and he was concerned about potential liability issues springing from Lolley's management of her subordinates. *Id.* at 68. After reading Sapio's letter, he was concerned about the other employees who were still under Lolley's supervision, as he did not feel comfortable with her behavior toward them. *Id.* at 69.

Defendants also submit evidence other employees had in the past expressed frustration with Lolley's management style. Jerry Rothouse ("Rothouse"), a Senior Vice President of Carson Energy, testified in his deposition that Sapio had come to his office crying about Lolley's treatment of her, and how Lolley apparently belittled and shouted at her, and Rothouse stated he informed DeNefe of this. Def.'s Mot. Summ. J., Ex. I ("Rothouse Depo.") at 23. Rothouse also

testified he had fielded complaints about Lolley's behavior from other of her subordinates, and had gone to DeNefe with these reports. *Id.* at 27-28. Likewise, Becky Bills, the co-owner and treasurer of Carson Energy, had received complaints from Jaime Faithful, another subordinate of Lolley's, that Lolley was mistreating her.[3] B. Bills Depo. at 20.

### C.     Lolley's Resignation from Carson Energy

Less than a month after Sapio's departure from Carson Energy, on May 21, 2008, Carter Bills ("Mr. Bills"), the president and co-owner of Carson Energy, came to Lolley's office and asked her to resign.[4] Pl. Depo. at 216. Lolley testified Mr. Bills told her he would give her six months of severance pay if she would turn in her resignation. *Id.* at 218. Lolley agreed and typed a letter of resignation, which she gave to Mr. Bills that same day. *Id.* at 219, 223. Lolley testified she was indeed paid her full salary and retained her benefits for the next six months. *Id.* at 223-24, 267.

However, Lolley nevertheless states in her affidavit that her resignation was not "voluntary." Pl. Aff. at 3. She states she felt coerced economically to choose resignation because

---

[3]Carrie Locke ("Locke") also testified during the time she worked as a receptionist and administrative assistant at Carson Energy and reported to Lolley, she felt Lolley was abusive toward her and she witnessed Lolley treat other employees in ways she felt was abusive. Def.'s Mot. Summ. J., Ex. C ("Locke Depo.") at 15, 21-22, 27. Locke testified the administrative assistants and receptionists working under Lolley repeatedly complained to her about the way Lolley treated them. *Id.* at 27. She stated Carson Energy had a "revolving door of receptionists," and "generally they all were either fired or quit because of [Lolley.]" *Id.* at 28. Likewise, Lloyd testified she observed Lolley treat her employees in a "demeaning way." Lloyd Depo. at 13. However, it is not clear from either Locke's or Lloyd's testimony whether Lolley's superiors were aware of these observations or complaints at the time Lolley resigned; therefore, it does not appear the testimony is directly relevant to Carson Energy's motivation for seeking Lolley's resignation.

[4]DeNefe testified the decision to take this action was ultimately Mr. Bills', although DeNefe participated in it as well. DeNefe Depo. at 136. DeNefe stated the decision was based on Lolley's "continued discrepancies, continued errors," and the letter written by Sapio. *Id.*

she needed the severance pay, and did not want to have a termination on her record. *Id.* She states "it was clear to me that my employment with Carson Energy was being terminated." *Id.* She also states when Mr. Bills asked her to resign in lieu of termination she was "shocked," and that he stated she "was not getting any better, and he did not see [her] getting any better." *Id.* She claims when she asked him if he was serious, he replied he was "serious as a heart attack." *Id.*

## II.    Procedural History

On the basis of the foregoing, Lolley filed the instant action on September 14, 2009, claiming Carson Energy discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Compl. [#1] at ¶ 5. Lolley seeks reinstatement to her position, her actual damages suffered "as a result of [Carson Energy]'s discriminatory conduct," damages for her "extreme emotional distress" suffered as a result of Carson Energy's actions, punitive damages, and costs and attorneys' fees. *Id.* at ¶ 9.

On June 30, 2010, Carson Energy filed a motion for summary judgment on all of Lolley's claims. *See* Def.'s Mot. Summ. J. [#15]. In the motion, Carson Energy asserts (1) Lolley has failed to carry her burden state a *prima facie* claim for severe and pervasive sexual harassment under Title VII or for discrimination on the basis of age, sex, or disability, and (2) Carson Energy has met its burden of producing evidence of legitimate, non-discriminatory reasons for its actions. Def.'s Mot. Summ. J. [#14]. Lolley filed a response which addresses only her claim of discrimination on the basis of her alleged disability under the ADA, but does not otherwise respond to Carson Energy's motion for summary judgment. *See* Pl.'s Resp. [#15].

**Analysis**

**I.      Summary Judgment Standard**

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996).  The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law.  FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings.  *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

**II.     Abandoned Claims**

As an initial matter, Lolley has chosen to respond to the summary judgment motion only with respect to her claim of discrimination under the ADA, and therefore it appears she has

abandoned her other claims, and summary judgment may be granted as unopposed as to those claims. *See, e.g., Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 976 (E.D. Tex. 2004) (holding where the defendant had fully briefed all of plaintiffs' claims on summary judgment, and plaintiffs only responded to some of the claims, plaintiffs were deemed to have abandoned their remaining claims). Carson Energy pointed this circumstance out in a reply filed on July 22, 2010—over a month ago—and Lolley has not disputed that she intends to abandon these claims. *See* Def.'s Reply at 1.

Lolley, the nonmoving party, has the burden of coming forward with competent evidentiary materials establishing a genuine fact issue for trial with respect to these claims, and it is well-settled she may not rest upon mere allegations or denials in her pleadings. *Anderson*, 477 U.S. at 256–57. Therefore, the Court finds because Lolley has not responded to the motion for summary judgment with respect to her claims for sex discrimination, sexual harassment, age discrimination, and retaliation, she has failed to raise a genuine issue of material fact as to any element of those claims, and Carson Energy is entitled to summary judgment with respect to them. The Court will proceed to consider her claim for disability discrimination, which is the only claim she addresses in her response.

### III.    Claim of Discrimination under the ADA

It is undisputed Lolley offers only circumstantial evidence to show the alleged unlawful discrimination under the ADA; therefore, the Court applies the *McDonnell Douglas* burden-shifting analysis to the claim. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, a plaintiff must first make a *prima facie* case of discrimination under the ADA by establishing the following: (1) she suffers from a disability; (2) she is qualified for the job despite

the disability; (3) she was subjected to an adverse employment action due to her disability; and (4) she was treated less favorably than non-disabled employees. *Id.* at 279-80.  Once the plaintiff makes this *prima facie* showing, the burden then shifts to the employer to articulate a "legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 280.  Once the employer articulates such a reason, the burden shifts back to the plaintiff, to establish by a preponderance of the evidence that the articulated reason was merely "a pretext for unlawful discrimination." *Id.* (citation omitted).

**(1)    Whether Lolley was regarded as disabled by Carson Energy**

The first element of Lolley's *prima facie* case may be satisfied by a showing she was either disabled or was "regarded as being disabled" by her employer.  *Id.*  This is true because "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of such impairment; or being ***regarded*** as having such an impairment." 42 U.S.C. § 12102 (emphasis added).  A "major life activity" includes such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2.

In the present case, Lolley freely admits she does not suffer from an actual disability which limits her in performing a major life activity; instead, she claims she is able to satisfy the first element by introducing evidence she was "regarded as" disabled by Carson Energy on account of her heart condition.  *See* Pl.'s Resp. at 5.  "In order to be 'regarded as' disabled a plaintiff must...have a physical or mental impairment that does not substantially limit major life activities, but be treated as such by an employer."  *McInnis*, 207 F.3d at 281; 29 C.F.R. § 1630.2(1).  "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those

individuals alleged to have taken discriminatory action." 29 C.F.R. § 1630.2(l)(1).  Thus, it must be established the employer entertained some misperception regarding the plaintiff—either that the plaintiff had a substantially limiting impairment which she actually did not have, or which was not so limiting as believed.  *Mason v. United Airlines, Inc.*, 274 F.3d 314, 317 (5th Cir. 2001).

In the instant case, Lolley contends she was wrongly perceived as disabled by Carson Energy in the major life activity of "working."  Pl.'s Resp. at 6.  In other words, she claims Carson Energy regarded her heart condition as substantially limiting her ability to work.  The Supreme Court has held "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).  Thus, to prevail, Lolley must prove she was regarded as "significantly restricted in the ability to perform either ***a class of jobs or a broad range of jobs*** in various classes as compared to the average person having comparable training skills and abilities."  *Id.* at 491 (emphasis added).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir.1995) (citation omitted).

In an attempt to prove her claim, Lolley claims Carson Energy effectively "imposed" the restriction of reduced hours on her in December 2006 (because the executives knew a reduction in hours was required by the disability policy of the insurance company), and then had her seek her physician's approval of this restriction (which he gave in January 2007) so they could "force [her] to meet the requirements to pursue a claim for long-term disability."  Pl.'s Resp. at 6.  She cites a letter written to her by DeNefe on December 12, 2006, in which he advised her that due

to her continued problems, work missed, and "ongoing medical condition," she was being put on a reduced work schedule.[5]  *Id.* (citing Ex. I ("DeNefe Depo") at 129.  Lolley's disability claim was ultimately denied, and she contends that once Carson Energy learned "their plan to push [Lolley] out of the work force on disability would not work because a lawyer did not think [Lolley] met the requirements for disability, she was asked to resign or be fired."  *Id.*  She claims it is important to note she was hospitalized on May 2, 2008, which was close in time to her resignation.  Pl.'s Resp. at 6-7.

Taking into account all the foregoing, the Court finds Lolley has not presented a single piece of competent summary judgment evidence which creates a genuine issue of material fact about whether Carson Energy regarded her as being substantially limited in the major life activity of working; in fact, the evidence she offers tends to disprove that thesis.  Taking all evidence in a light most favorable to Lolley, it appears she was told in December 2006 she would be put on a reduced part-time schedule so she could pursue a disability claim with the insurance company.  Pl. Depo. at 40.  Lolley admits her doctor did advise her in January 2007 to work reduced hours.  *Id.* at 68; Pl.'s Resp., Ex. E.  Lolley was eventually denied long-term disability benefits by the insurance company, and this decision was affirmed on appeal.  Pl. Depo. at 37-38, 49, 97-98.  After the appeal was denied by the insurance company, Lolley sets forth evidence Carson Energy consulted an attorney about appealing the decision in court; however, the attorney wrote a letter in March of 2008 stating in no uncertain terms that he did not believe Lolley qualified for partial disability.  *See* Pl.'s Resp. at Ex. H (letter from attorney).  It is also undisputed Lolley was cleared

---

[5]DeNefe testified this letter was a product of the fact they had been notified by the insurance company representative that it was necessary to sustain a disability claim that Lolley have documentation showing she was under a restriction and there was a reduction in her hours and pay.  DeNefe Depo. at 129.

to return to work without restrictions in October 2007, some seven months before her resignation, and that Carson Energy reinstated her to full-time status and full-time wages at that time. Pl. Depo. at 65.

The Fifth Circuit considered a case somewhat similar to the present one in *Dupre v. Charter Behavioral Health Systems of Layfayette, Inc.*, in which the plaintiff-employee (Dupre) claimed she was disabled because she could not stand or sit in one place for more than an hour due to a back condition. 242 F.3d 610, 611-12 (5th Cir. 2001). Dupre was ultimately discharged, and she soon thereafter filed suit, claiming she was discriminated against on the basis of her disability. The district court granted summary judgment in favor of the employer, and Dupre appealed.

The Fifth Circuit first addressed whether Dupre had a substantially limiting impairment under the ADA, and found she did not. *Id.* at 614-15. Next, the court turned to whether the employer had "regarded" Dupre as disabled, even though she was not actually disabled. The Fifth Circuit found it was clear the employer had known she had a back impairment because the employer had undisputedly known the following: Dupre had filled out a screening form indicating she had a back injury, had undergone surgery, was taking medication for back pain, had requested accommodations for her back, and had been allowed to leave work early after her supervisor observed her having difficulties sitting in her chair. *Id.* at 616. Dupre also stated in her affidavit that when she was fired, her immediate supervisor referred to her back problem as if it were a reason for her termination. *Id.* Dupre argued this record created a genuine issue of material fact as to whether the employer regarded her as having a substantially limiting impairment of a major life activity. *Id.*

However, the Fifth Circuit found Dupre "was not in fact substantially limited in any major life activity and ***nothing in the record indicates that [the employer]'s perception of Dupre's condition was in any way inaccurate***." *Id.* (emphasis added).  In other words, Dupre had shown the employer knew of her back condition, but had not shown the employer had any mistaken belief about the level of her limitations.  The Fifth Circuit continued, "[e]ven if we assume [the employer] thought that Dupre's condition would cause her to be absent, there is no evidence [the employer] thought that Dupre was unable to perform other jobs." *Id.*  Thus, even if the evidence showed the employer doubted she was capable of performing the required duties of her specific position with the requisite consistency, or believed her incapable of performing a particular job, this was not evidence the employer necessarily regarded her as having a substantially limiting impairment.  *Id.*  Thus, the Fifth Circuit concluded nothing in the record, including Dupre's account of her firing, provided support for her claim that the employer perceived her as having more of an impairment than she actually had, and it therefore affirmed the district court's grant of summary judgment on the issue of whether the employer had regarded Dupre as disabled within the meaning of 42 U.S.C. § 12102(2)(C).  *Id.* at 616-17.

In the instant case, Lolley has set forth even less convincing evidence than the plaintiff in *Dupre*.  Similarly to the plaintiff in *Dupre*, she relies solely on evidence Carson Energy knew of her heart problem (which it clearly did), but she has wholly failed to set forth any evidence Carson Energy perceived her as having more of an impairment than she actually had.  In fact, the evidence shows Carson Energy reinstated her to full-time pay and wages upon receipt of her physician's letter clearing her to work full-time in October 2007, and on March 27, 2008, it received a letter from the attorney who had been consulted regarding the appeal, in which he stated definitively that nothing in Lolley's medical records indicated she could not perform the

requirements of her position.[6]  In short, Lolley has presented evidence Carson Energy executives were told in clear and precise terms by an attorney who had reviewed her medical records that Lolley did not qualify as disabled.  Thus, it appears from the undisputed evidence Carson Energy had a very clear picture of exactly the nature of Lolley's impairments.

Furthermore, even if it is true Mr. Bills stated at the time he asked Lolley to resign that she "was not getting any better, and he did not see [her] getting any better," and responded to her question of whether he was serious with the statement he was as "serious as a heart attack," Pl.'s Aff. at 3, these statements are not evidence he regarded her as substantially limited in her ability to perform the substantial life activity of working.  The latter statement is a very common phrase, and does not indicate anything about Mr. Bills' perception of Lolley's heart condition.  The former statement is, at best, extremely tenuous evidence Plaintiff was terminated in part because Carson Energy doubted she was capable of performing the required duties of her position with the requisite consistency, or believed she was incapable of performing some of the duties of her job.  But the Fifth Circuit has held that even when there is evidence an employer *has* terminated an employee for her inability to perform the duties of a specific job, this is still not evidence the employer necessarily regarded the employee as unable to perform the substantial life activity of

---

[6]Specifically, the attorney wrote,

> The letters from [Lolley's] doctor can be fairly interpreted to say [she] is limited in the amount of time she can work, but not that she 'cannot or is unable to do' the duties 'normally required in the performance of her regular occupation.'  [The doctor's] letters do not say the magic words and it appears that the records could be fairly interpreted to say that [Lolley] could do the duties—just not for 40 hours.  ...So, it appears to me that [Lolley] does not qualify as disabled under the policy language, based upon the information I have.

Pl.'s Resp. at Ex. H.  There is no evidence Carson Energy argued with this determination by the attorney, attempted to offer him any more evidence to review, or attempted to obtain the services of another attorney.

working.  *Dupre*, 242 F.3d at 616.  Again, "[f]or an employer to regard an impairment as substantially limiting work, the employer must regard an individual as significantly restricted in his ability to perform a class or broad range of jobs." *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1051-52 (5th Cir. 1998).  Thus, in *Dupre*, the court stated "even if we assume that [the employer] thought that Dupre's condition would cause her to be absent, there is no evidence that [the employer] thought that Dupre was unable to perform other jobs." 242 F.3d at 616.  The same is true of the present case.

       In sum, because there is not a scintilla of evidence in the record which indicates Carson Energy mistakenly regarded Lolley as substantially limited in the major life activity of working, the Court finds Lolley has failed to produce any evidence of the "disability" element of her *prima facie* case for discrimination under the ADA, and summary judgment is therefore appropriate on Lolley's sole remaining claim.  Nonetheless, in order to develop the record as fully as possible, the Court will proceed to consider whether Carson Energy has articulated a legitimate, non-discriminatory reason for asking Plaintiff to resign and, if so, whether Lolley has produced any evidence the reason was merely a pretext for unlawful discrimination.[7]  *McInnis*, 207 F.3d at 282.

---

[7]As noted above, under the *McDonnell Douglas* framework, once a plaintiff makes a *prima facie* showing of discrimination on the basis of a disability, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  And once the defendant articulates such a reason, the presumption of unlawful discrimination disappears and the burden shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination.  *McInnis*, 207 F.3d at 282.

(2)     **Whether Carson Energy has offered a legitimate reason for its actions[8]**

Carson Energy's stated reasons for deciding to ask Lolley to resign are two-fold: (1) her failure to timely complete her tasks for the K-1 process in early 2008; and (2) her mistreatment of her subordinates, as documented in a letter from Sapio to DeNefe on April 23, 2008.  Both reasons are documented by substantial evidence, as is detailed in the background section of this order, *see supra* at pp. 3-7, and both appear to be legitimate and non-discriminatory.  It is well-settled an employee's poor work performance and failure to get along with fellow employees are legitimate, non-discriminatory justifications for termination.  *See, e.g. Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999).

---

[8]For the purposes of this discussion, the Court will assume Carson Energy did take an "adverse employment action" against Lolley.  However, this element of Lolley's *prima facie* case is not at all clear.  The evidence is undisputed that Lolley voluntarily resigned from her employment and was granted full severance pay and benefits.  Lolley claims the decision was not truly voluntarily because she was essentially given the choice to either resign or be fired, and was "economically coerced" into choosing resignation.  The Fifth Circuit recently considered at length (although in the context of an FMLA case) which employment decisions are properly considered "adverse employment actions."  *See Mowbray v. Am. Gen. Life Cos.*, 162 Fed. App'x 369, 374 (5th Cir. 2006).  The court held "[n]either verbal threats of termination nor merely being at risk of termination constitutes an adverse employment action."  *Id.* (citing, among others, *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).  The Fifth Circuit went on to find the plaintiff had not suffered an adverse employment action because the plaintiff had "opted to resign and collect her severance package before [the employer] made an ultimate employment decision regarding her position[.]"  *Id.*  Thus, although a forced resignation may constitute an adverse employment action in some cases, it is unclear whether or to what extent Lolley was "forced" to resign in this case.  Lolley presents little evidence of what exactly transpired at the meeting between her and Mr. Bills, and no evidence of whether he had already decided at that time to terminate her if she refused to resign.  Thus, the Court has doubts about whether Carson Energy did indeed take any "adverse employment action" against Lolley.  However, the Court will assume *arguendo* it did in order to consider the rest of the motion in full.

### (3)      Whether Lolley has offered evidence of pretext

Because Carson Energy has set forth legitimate, non-discriminatory reasons for its action, the burden of production now shifts back to Lolley to prove Carson Energy's reasons are merely a pretext for discrimination.  Lolley claims the K-1 issue is a pretext for discrimination because there is no evidence any Carson Energy investor "suffered any known ill consequences" as a result of the delay in submitting the K-1 information to the CPA firm, nor is there any evidence Lolley was perceived at the time as being solely responsible for the delay.  Pl.'s Resp. at 7.  In fact, Lolley claims the delay was actually caused by the errors of one of her subordinates, Chamberlain, whose incompetence created extra work for Lolley.  *Id.* (citing House Aff.).

But none of this evidence is sufficient to raise an issue of fact about whether Carson Energy's proffered reason of Lolley's poor performance of her K-1 duties in 2008 was a pretext for discrimination.  First, whether any client actually suffered damages from the delay in submitting the K-1 information is irrelevant.  The suggestion an employer must wait until one of its clients is actually injured by an employee's performance of her duties in order to terminate that employee for poor performance is absurd; it is common sense that an employer may institute rules and deadlines to proactively protect its clients' interests.  This is a reasonable and typical exercise of an employer's discretion, not a pretext to mask discrimination.  Employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor... to transform the courts into personnel managers," *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988), and it is not for this Court to say the deadlines set by Lolley's superiors were unessential.

Furthermore, the fact there is no evidence Lolley was perceived by DeNefe during the delay as singly responsible for the delay is also irrelevant, as the uncontroverted testimony of

DeNefe is that some time **after** he called the February 27th meeting with Lolley and Lloyd to discuss the delay, he "consulted with various employees involved in the process and...confirmed that the hold-up in getting the information out to the CPAs in a timely manner was primarily due to [Lolley] causing delay on the administrative side." DeNefe Aff. at ¶ 6. DeNefe has stated under oath he was not aware who was responsible for the delay at the time of the February 27th meeting, and thus Lolley's protestations that DeNefe did not single her out as responsible at the meeting do not conflict with his testimony in any way.

Likewise, the fact a subordinate of Lolley's may have been the true source of the delay is also irrelevant to a showing of pretext. Lolley was undisputedly in charge of the administrative side of Carson Energy at the time of the delay, and therefore was presumably responsible for her subordinates in the administrative group. It does not tend to show pretext to show her employer held her responsible for her section and the work of her subordinates. In fact, even if Lolley had produced evidence someone **outside** the administrative section was responsible for delay (which she has not), neither would this necessarily indicate pretext, as the Fifth Circuit has explained, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination. *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991). Lolley has offered no evidence to rebut the fact there was an unreasonable delay in the K-1 process in early 2008 which upset her employers, or that her direct supervisor (DeNefe) ultimately came to believe she bore the responsibility for that delay, and thus she has offered no evidence tending to show the issue of her poor performance with respect to the K-1s is a pretext for discrimination.

Lolley also claims the issue of her mistreating her subordinates is a pretext. She argues DeNefe, her supervisor, admits he used the f-word loudly in the February 27th meeting with her,

Pl.'s Resp. at 8, and presents evidence that in Sapio's deposition, Sapio apparently toned down some of her claims against Lolley and appeared to be overly sensitive in general, admitting she sometimes goes home crying from her current job. *See id.* (citing Sapio Depo. at 12, 22). However, this evidence is not sufficient to show Carson Energy's belief that Lolley mistreated her subordinates was a pretext for its actual motivation. First, her argument that DeNefe's one-time use of the f-word was more disruptive or offensive than the behavior complained of on her part by Sapio and others is not evidence of pretext, but simply her opinion. *See Schakelford*, 190 F.3d at 408; *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325-26 (5th Cir. 2002) ("Merely disagreeing with an employer's negative performance assessment is insufficient to show pretext."). Lolley provides no evidence that challenges the accuracy of Sapio's letter or of DeNefe's testimony that there had been a large amount of turnover in the employees who were working under Lolley, "a lot of friction" generated by how Lolley was managing those employees, and that the problem was ongoing, and "got worse and worse" as time went on. *Id.* at 46-48.

Likewise, Sapio's deposition testimony is also irrelevant to the issue of pretext. Even if Sapio did describe Lolley's treatment of her more favorably in her deposition than she did in her April 2008 letter, and even if Sapio testified she has also had problems in her current job, there is no evidence any of this information was known to Carson Energy management at the time they received Sapio's letter and decided to ask Lolley to resign. Therefore, the evidence does not refute Carson Energy's claim that Sapio's letter and Lolley's treatment of her subordinates was a reason for its decision to ask Lolley to resign.

In short, even if Lolley were able to state a *prima facie* claim for discrimination on the basis of a disability (which she is not), the Court finds it is also fatal to her claim that Carson

Energy has articulated a legitimate, non-discriminatory rationale for taking an "adverse employment action" against her, which Lolley has not rebutted by producing evidence indicating the articulated reason was merely a pretext for unlawful discrimination. Thus, Carson Energy is entitled to summary judgment on her claim of discrimination on this basis as well.

### Conclusion

In conclusion, the Court finds Lolley has abandoned her claims—insofar as she raised them—for sex discrimination, sexual harassment, age discrimination, and retaliation. The Court also finds Lolley has failed to state a *prima facie* claim of discrimination under the ADA, and has failed to offer any evidence to rebut Carson Energy's legitimate, non-discriminatory reasons for seeking her resignation. Thus, Carson Energy is entitled to summary judgment on all of Lolley's claims.

In accordance with the foregoing,

IT IS ORDERED that Defendant Carson Energy, Inc.'s Motion for Summary Judgment [#14] is GRANTED, in accordance with the foregoing order.

SIGNED this the 23rd day of August 2010.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE